08 CV 2746

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Judge Berman

-------------------------------------------------X

CURZON MARITIME LIMITED           :

          Plaintiff,           :

    - against -           :           ECF CASE

COMMODITIES INTERTRADE a/k/a.           :
COMMODITIES INTERTRADE PVT LTD.
                    :

          Defendant.

-------------------------------------------------X

MAR 14 2008
U.S.D.C. S.D.N.Y.
CASHIERS

## VERIFIED COMPLAINT

Plaintiff, CURZON MARITIME LIMITED ("Plaintiff"), by and through its attorneys,

Tisdale Law Offices LLC, as and for its Verified Complaint against the Defendant,

COMMODITIES INTERTRADE a/k/a COMMODITIES INTERTRADE PVT LTD.,

("Defendant"), alleges, upon information and belief, as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.

    2.    At all times material, Plaintiff was, and still is, a foreign company duly organized

and operating under foreign law with a principal place of business at St. Clare House, 3033

Minories, London, and at all material times was the disponent owner of the M/V SHIKOKU

PRIDE ("Vessel").

    3.    Upon information and belief, Defendant was, and still is, a foreign corporation or

other business entity organized under and existing by virtue of foreign law, with a principal place

of business at 14 Dr. Rajendra Prasad Road, New Delhi, India 110 001 and at all material times

was the charterer of the Vessel.

4.     Pursuant to the terms of a standard GENCON charter party dated September 11, 2001, the Plaintiff chartered the Vessel to the Defendant for a voyage from the west coast of India to Port Sudan with a cargo of minimum 15,250 MT of sugar.

5.     The Vessel arrived at Mumbai and began to load her cargo of sugar on 29 September 2001. The loading operations were completed on 21 December 2001.

6.     The Vessel departed from Mumbai on 21 December 2001 and arrived at her discharge port on 31 December 2001.

7.     The charter party stated that freight was to be paid (together with any load port demurrage) to the Owners within four Indian banking days "upon completion of loading and signing the bills of lading."

8.     The freight was to be received by Owners before the Vessel reached her discharge port, otherwise the Vessel would anchor outside of the port territory.

9.     The charter party provided that if freight was not paid as described therein, then "any/all time lost, due to unpaid freight, will count as detention, at the rate of USD $6,000 per day."

10.     As a result of the Defendant's failure to pay any freight due and owing, an agreement was reached between the parties and the shipper of the cargo whereby payments were to be made to the Owners for outstanding balances due to the Owners under the charter party.

11.     Certain freight and demurrage payments were remitted to the Owners, but there remained due and owing under the charter party freight balances, load port demurrage and detention charges which were never paid to the Owners, despite due demand for same.

12.     The charter party provides that any disputes arising thereunder shall be referred to arbitration London, as per the LMAA Rules, with English law to apply.

13.    Plaintiff commenced arbitration proceedings before a sole arbitrator against the Defendant in London, pursuant to the charter party's arbitration clause, and notice of the commencement of the proceedings was forwarded to the Defendant Charterers.

14.    The Defendant Charterers advised Plaintiff that they had forwarded the matter to their legal department, but they failed to appoint an arbitrator, despite that further notice of the arbitration was served on them. The arbitration proceeded thereafter with a single arbitrator appointed by Owners.

15.    By final award dated 30 September 2002 the arbitrator awarded Plaintiff the sum of $185,525.32 on its principal claim, with compounded quarterly interest at the rate of 4% per annum from February 1, 2002 to the date of payment. A copy of the Final Award is attached as Exhibit 1.

16.    The Final Award also awarded attorneys fees and arbitrator costs to the Plaintiff Owners, with interest on each of these items of damages, calculated at the rate of 6%, compounded quarterly, from 30 September 2002 until the date of payment.

17.    Despite due demand, Defendant has failed to pay the amounts due to Plaintiff under the arbitration award.

18.    Plaintiff is entitled to judgment on the final awards as follows:

| | | |
|---|---|---|
| A. | On the principal claim: | $185,525.32 |
| B. | Interest on the principal claim at 4% compounded quarterly from Feb. 1, 2002: | $51,122.88 |
| C. | Arbitrator's Costs on Award £2,200 converted to USD on Sept. 30, 2002 | $3,435.08 |
| D. | Interest on Arbitrator's Costs at 6% compounded quarterly from Sept. 30, 2002 | $1,318.50 |
| G. | Owner's Costs of the Sept. 30, 2002 | $27,691.28 |

H.  Interest on Costs of Award at 6%
compounded quarterly from Sept. 30, 2002  $10,628.83

**Total:**                                    **$279,721.89**

19.  The Defendant cannot be found within this District within the meaning of

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal

Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during

the pendency of this action, assets within this District and subject to the jurisdiction of this Court,

held in the hands of garnishees within the District which are believed to be due and owing to the

Defendant.

20.  The Plaintiff seeks an order from this court directing the Clerk of Court to

issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental

Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States

Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any property of the Defendant held by

any garnishees within the District for the purpose of obtaining personal jurisdiction over the

Defendant and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.  That process in due form of law issue against the Defendant, citing it to appear

and answer under oath all and singular the matters alleged in the Complaint, failing which

default judgment be entered against it in the sum of **$279,721.89.**

B.  That since the Defendant cannot be found within this District pursuant to

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue

an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment

pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also

4

pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels,

credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any

other funds up to the amount of **$279,721.89** belonging to, due or being transferred to, from, or

for the benefit of the Defendant, including but not limited to such property as may be held,

received or transferred in Defendant's name or as may be held, received or transferred for its

benefit at, moving through, or within the possession, custody or control of banking/financial

institutions and/or other institutions or such other garnishee(s) to be named, and that all persons

claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty

Rule B answer the matters alleged in the Complaint;

      C.     That this Court award Plaintiff the attorneys' fees and costs incurred in this

action; and

      D.     That the Plaintiff have such other, further and different relief as the Court

may deem just and proper.

Dated: March 14, 2008
      New York, NY

                        The Plaintiff,
                        CURZON MARITIME LIMITED

                        By: _____
                        Claurisse Campanale Orozco (CC3581)
                        Thomas L. Tisdale (TT
                        TISDALE LAW OFFICES LLC
                        11 West 42nd Street, Suite 900
                        New York, NY 10036
                        (212) 354-0025 – phone
                        (212) 869-0067 – fax
                        corozco@tisdale-law.com
                        ttisdale@tisdale-law.com

## ATTORNEY'S VERIFICATION

State of Connecticut  )
                      )     ss.:     Town of Southport
County of Fairfield   )

1.     My name is Claurisse Campanale Orozco

2.     I am over 18 years of age, of sound mind, capable of making this
Verification, and fully competent to testify to all matters stated herein.

3.     I am a Partner in the firm of Tisdale Law Offices LLC, attorneys for the
Plaintiff.

4.     I have read the foregoing Verified Complaint and know the contents
thereof and believe the same to be true and accurate to the best of my knowledge, information
and belief.

5.     The reason why this Verification is being made by the deponent and not
by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now
within this District.

6.     The source of my knowledge and the grounds for my belief are the
statements made, and the documents and information received from, the Plaintiff and agents
and/or representatives of the Plaintiff.

7.     I am authorized to make this Verification on behalf of the Plaintiff.

Dated:        Southport, Connecticut
              March 14, 2008

              Claurisse Campanale Orozco

# EXHIBIT 1

# IN THE MATTER OF THE ARBITRATION ACT 1996

## AND

# IN THE MATTER OF AN ARBITRATION

### BETWEEN:

CURZON MARITIME LTD of England    Claimants

(Disponent Owners)


and


COMMODITIES INTERTRADE (INDIA) PVT LTD of India    Respondents

(Charterers)


## "SHIKOKU PRIDE" C/P dd 11.9.01

### FINAL AWARD

### WHEREAS:

(A)  By a charterparty agreement based on the Gencon form, with
amendments, as set out in a fixture recapitulation message from Intercont
Agencies of Mumbai dated 11th September, 2001, the claimants ("the
owners") chartered to the respondents ("the charterers") the ship
"Shikoku Pride" for a voyage on terms and conditions more particularly set
out therein.

(B)  The agreed provisions of box 25 and of clause 19 of the said charter
agreement provided for any dispute arising thereunder to be referred to
arbitration in London as per "LMAA RULES", i.e. the LMAA Terms, and
under English law.

(C) Disputes arose for the determination of which the owners appointed me, the undersigned Bruce Harris of 104 Ledbury Road, London W11 2AH as arbitrator. Notice of my appointment in that capacity was given on 14th March, 2002 to the charterers who were called upon, in accordance with the agreed provisions relating to arbitration, to appoint an arbitrator on their behalf within 14 days. The charterers responded asking that the owners' solicitors explain the "REASON/CAUSE/PENDING DISPUTE" in respect of which I was appointed and those solicitors answered on 2nd April whereafter (on 5th April) the charterers said that they had referred the matter to their legal department. Meanwhile the charterers failed to appoint an arbitrator on their behalf. On 29th March, 2002 the owners' solicitors served them with a further notice under s.17 of the Arbitration Act 1996 requiring an appointment within seven clear days but still the charterers failed to appoint. On 17th April, 2002, the charterers still having failed to make an appointment, I accepted appointment as sole arbitrator pursuant to the provisions of the said charter agreement and English law, and notice of my appointment in that capacity was given to the charterers by the owners' solicitors and confirmed by me. The seat of the arbitration is England.

(D) The disputes referred to me concerned the owners' claims as more fully particularised in the Reasons herefor which are annexed and which are deemed to be fully incorporated herein. Particulars and the owners' submissions were set out in a letter from their solicitors of 29th May, 2002 which, with accompanying documents, was copied to the charterers. On 1st June I sent a fax directing the charterers to provide their submissions by 29th June. They replied to the claim submissions stating that the charter was fraudulent and not *bona fide*, repeating that on 30th June when the owners' solicitors wrote asking me to make a peremptory order for service of the charterers' submissions. I replied the same day stating that on what I had seen it seemed to me *prima facie* that there was a contract under which I had been validly appointed, and that therefore I should proceed. I urged the charterers, if they considered that they were

not contractually bound, to participate in the arbitration and to make submissions to me on their case as to not being bound; and I made a peremptory order for service of their submissions by 15th July, 2002, indicating that if this order was not complied with I would consider myself at liberty to proceed to an Award on the basis of the owners' submissions and documents alone. In due course the charterers reiterated their stance but having taken the view I had, and without any supporting arguments or evidence from the charterers, I felt bound to proceed. After raising certain queries with the owners' solicitors I accordingly proceeded to this Award on the basis of the owners' submissions and documents alone and without an oral hearing, neither side having requested one and one not in my view being necessary.

NOW I the said Bruce Harris having taken upon myself the burden of this reference and having carefully and conscientiously read and considered the submissions and documents put before me and given due weight thereto, and for the reasons set out in the document annexed hereto which forms part hereof DO HEREBY MAKE, ISSUE AND PUBLISH this my FINAL AWARD as follows:

1. I FIND AND HOLD that the owners' claims succeed to the extent of $185,525.32 only.

2. I THEREFORE AWARD AND ADJUDGE that the charterers shall pay to the owners the sum of $185,525.32 (One hundred and eighty-five thousand five hundred and twenty-five United States Dollars and thirty-two cents) together with interest thereon at the rate of 4% (four per cent) per annum, compounded at three-monthly rests, from 1st February, 2002 until the date of payment hereunder.

3. I FURTHER AWARD AND DIRECT that the charterers shall bear and pay their own and the owners' costs of this reference (on the standard basis), and I reserve to myself the right to assess and make a further Award fixing the amount of the owners' said costs; AND that the charterers shall bear and pay the costs of this my Award which I hereby fix in the sum of

£2,200 (Two thousand two hundred Pounds Sterling) **PROVIDED** that if in the first instance, the owners shall have paid any amount in respect of the costs of this Award they shall be entitled to an immediate refund from the charterers of the sum so paid.

4.   **FURTHER** the charterers are to pay the owners interest on the sums awarded in para. 3 above at the rate of 6% (six per cent) per annum compounded at three-monthly rests, from the date hereof until the date of payment by the charterers to the owners in the case of the owners' costs, and from the date of any payment to me by the owners until the date of reimbursement to them by the charterers in respect of the costs hereof.

**GIVEN** under my hand this 30th day of September, 2002

Sole Arbitrator

Witness

## "SHIKOKU PRIDE" C/P dd 11.9.01 & Bs/L SP/01/SD/01 and SP/01/SD/02 (Cargo loaded 21.12.01)

## REASONS
### for, and forming part of

## FINAL AWARDS dated 30th September, 2002

1.  On 11th September, 2001, a charterparty contract was concluded between the owners of "Shikoku Pride", the claimants in these arbitrations (who were represented in the negotiations leading to the fixture by Pacific & Atlantic Corp.), and Commodities Intertrade (India) Ltd as charterers (respondents in one of these arbitrations).

2.  The fixture was confirmed in a recap message sent that day by Intercont Agencies of Mumbai.   It was then embodied in a charterparty of, of course, the same date, which was (as agreed) on the Gencon form with various amendments and additions.   Though that charter was never signed by the charterers, it did of course reflect a binding contract that had already been concluded between the owners and the charterers.

3.  This charter was for a voyage from Mumbai with a cargo of bagged sugar destined for Port Sudan.   Pursuant to it the ship started loading such a cargo at Mumbai on 29th September, 2001.   She did not complete loading until 21st December, sailing on that day for her discharging port.

4.  She arrived off Port Sudan on 31st December.   By that time, freight had not been paid under the charter notwithstanding that pursuant

to clause 27 thereof freight was to be paid (together with any loading port demurrage) to the owners within four Indian banking days "upon completion of loading and signing of bill(s) of lading".

5.  Clause 27 went on to provide that if the freight had not reached the owners' bank account before the ship arrived at Port Sudan, she would be instructed to drop anchor outside Sudanese territorial waters "and any/all time lost, due to unpaid freight, will count as detention, at the rate of USD 6,000 per day".

6.  Negotiations took place between the cargo shippers, PEC Ltd of New Delhi (respondents in the other of these arbitrations), the charterers and the owners. An agreement was reached between all three parties, i.e. the claimant owners and the respondent charterers and shippers respectively, on or about $9^{th}/10^{th}$ January, 2002. This was reflected in a letter of the former date from the charterers to the owners, and one of the latter date from the shippers to the owners.

7.  The charterers' letter confirmed that the shippers had irrevocable authority from them to give instructions under the charter on their behalf. Further, in consideration of the owners continuing to perform the charter notwithstanding the charterers' failure to pay freight, deadfreight and demurrage, the charterers irrevocably assigned to the shippers their right to receive address commission and any dispatch.

8.  They also agreed and acknowledged that notice of readiness to discharge had been validly given and accepted on 31st December, 2001 and that at that date the ship had been deemed "arrived" and ready in all respects; and that laytime started running at 1300 hours on that date. This letter was signed for the charterers by Mr Yog Raj Chauhan whose signature was witnessed by a Notary Public.

9. The shippers' letter, signed on their behalf by Mr Lalit Dongre (whose signature was similarly witnessed and whose Power of Attorney to sign such letter was annexed), was rather longer. Reference to its full terms may be made as if it had been set out fully in these Reasons (as indeed is the case for any other documents referred to herein).

10. In outline, the letter provided that in consideration of payment by the owners of US$1 and of their no longer exercising their legal rights under the charter including their clause 27 rights, and of them performing the charter notwithstanding the charterers' breaches, the shippers would pay the owners all freight and deadfreight due under the charter (less commissions), and would, upon signing of the letter in question, pay the loading port demurrage which was agreed at $300,000 net of commission.

11. The letter further acknowledged acceptance by the shippers that notice of readiness had been validly given and accepted on 31st December, 2001 and that the ship was then arrived and ready, and that laytime started at 1300 hours that day. The shippers guaranteed payment of all discharging port demurrage, at the rate of $6,000 per day (to be compared with the charter demurrage rate of $4,500 per day). Other provisions need not be referred to here.

12. On 15th January, 2002, the shippers paid the owners $549,932.29 in respect of the balance of freight due and the loading port demurrage, pursuant to the charter and/or bills of lading and/or the agreement. Thereafter the ship continued its voyage.

13. The owners contended, and I find, that there remained outstanding from the shippers to the owners the sum of $10,204.29 in respect

of the balance of freight and loading port demurrage. In the arbitration against the charterers the owners originally claimed that sum from them too, but after I raised a query on the duplication of claims, the owners dropped the claim for this amount against the charterers and pursued it only against the shippers.

14.  From the charterers they also claimed \$90,000 in respect of detention, namely 15 days (from 31st December, 2001 to 15th January, 2002) at the clause 27 rate of \$6,000 per day, as well as demurrage at Port Sudan amounting to \$115,777.01 ( calculated at the rate of \$6,000 per day) and further losses resulting from the charterers' failure to pay freight on time, plus interest generally. The further losses just referred to were particularised late in the arbitration as fees and costs relating to the finding and implementing of a solution to the problem, in the shape of correspondents' and lawyers' fees totalling \$8,692.57.

15.  From the shippers, the owners claimed the \$10,204.29 already mentioned, demurrage of \$115,777.01, an indemnity in respect of a cargo claim settlement and the costs incurred in relation thereto in the total sum of \$26,687.93, as well as additional expenses of \$6,078.73 and interest generally.

16.  Before dealing with the owners' claims in any further detail, I must cover certain procedural or jurisdictional matters because of points taken by the charterers and the shippers. In correspondence with the owners' representatives and subsequently with me, both before and after the start of the arbitrations, the shippers asserted - although without giving any detailed particulars that I am aware of - that the owners in collusion with Preetika Shipping Agency Pvt. Ltd presented a forged charterparty and bill of lading, and received "false freight amount". Investigations by the owners suggested

that, presumably during the negotiations following the charterers' failure to pay freight, Preetika had without authority represented to the shippers that the freight rate under the charter was $22 rather than $21 per metric ton and had retained the difference without passing it to the owners.

17. I took and expressed to the owners' solicitors and the shippers the provisional view that, even if proved, the shippers' allegations would not prevent the contractual documents to which the shippers appeared to be parties, i.e. the bills of lading and the agreement of 9th/10th January, from being binding and that thus I had jurisdiction and should proceed with the arbitration. That is also my final view.

18. I do not see how what it seems Preetika did can in any way vitiate the contracts made. It is possible - I put it no higher than that, whilst observing that everything is possible in the universe - that the shippers might have some claim against the owners arising from what occurred; but they should have participated in the arbitration and advanced any such claim instead of suggesting that the arbitration was illegal, and refusing to participate in it.

19. Accordingly, I plainly have jurisdiction in the arbitration against the shippers, and the contractual documents referred to above are binding upon them and they must meet their obligations thereunder.

20. The charterers' position was slightly different. They said that the charter was fraudulent and not *bona fide*, and that the charter on which they owners were relying was never signed by them, the charterers, and they were under no contractual obligation to the owners. Again, no other particulars were given. If, as I assume, the point about fraud was the same as that raised by the shippers it must fail for the same reasons. If the charter was not valid or *bona*

*fide* then, I ask rhetorically, why did the charterers perform it, at least by loading the ship and subsequently signing the letter of 9th January, 2002?

21.  The fact that the charterers did not sign the charter is neither here nor there. It is sufficient that the parties reached full agreement on the terms of a contract, as they plainly did (see the brokers' recap). There was thus a binding contract containing an arbitration clause, and - as in the case of the shippers - the charterers had and must meet their legal obligations under that contract and under the letter of 9th January.

22.  As with the shippers, I expressed a provisional view that I had jurisdiction. I invited the charterers to try persuading me otherwise, and in any event to participate in the arbitration, but they declined to do so.

23.  I must add, in relation to any suggestions of fraud, that I agree with the owners' submissions in this respect. In particular, the burden of proving such an allegation is squarely on the party asserting it. That is in fact a heavy burden, rightly so having regard to the seriousness of the allegation. Here, the shippers and charterers did not even begin to discharge it. How could they, when they did not particularise their case(s) let alone participate in the arbitrations?

24.  In these circumstances I could simply dismiss the allegations out of hand, and indeed I do so; but as I have indicated above, even if the allegations were true I do not see how they could affect either my jurisdiction or the owners' rights in respect of the claims they advanced.

25. In these circumstances it is now convenient to turn to consider the owners' claims, which I have already outlined. I deal first with the position between owners and charterers. I have already noted that the owners did not pursue against the charterers the claim originally intimated for $10,204.29 in respect of a balance of freight and loading port demurrage.

26. The first of the owners' claims against the charterers is for detention compensation under clause 27 of $90,000. That was plainly due to the owners under the charter. The precise circumstances envisaged by the provisions of that clause as summarised in paragraph 3 above had arisen and continued for 15 days. That meant that the owners were entitled to 15 days' compensation at $6,000 per day. Nothing in the agreement reached on 9th/10th January affected that entitlement in any way. It followed that this claim had to succeed.

27. Whilst not pursuing the claim for the balance of freight/loading port demurrage against charterers, the owners did, of course, pursue the claim for discharging port demurrage against them. They put that in the same sum as that claimed from the shippers, which was of course calculated at the specially agreed rate of $6,000 per day. However, I could see no agreement with the charterers upon that rate, or indeed upon any rate other than the $4,500 agreed in the charter originally.

28. Nothing in the charterers' letter of 9th January can be construed as agreeing to the enhanced demurrage rate: indeed it is noteworthy that whilst the agreement with the shippers not only dealt with the counting of laytime, etc. (as did the charterers' letter), but also went on to refer to the newly agreed demurrage rate and the shippers' specific obligation to pay such demurrage, the charterers' letter was quite silent on these matters.

29. In their submissions in the arbitration with the shippers, although curiously enough not in their submissions against the charterers, the owners said that the charterers agreed to the terms of the shippers' agreement by reference (although there was no reference in the charterers' letter to that from the shippers), and added that it was originally intended that the charterers' letter should be on the same paper as the shippers'. There was no evidence about this, however.

30. It is true that the charterers' letter referred to "the agreement of [the shippers] as set out above", and that no such agreement was so set out, but even if - which is not certain - that was a reference to the agreement the shippers signed the following day, that is not enough to bind the charterers, without an express reference, to the higher demurrage rate. Accordingly any claim for demurrage against the charterers could only succeed at the rate of $4,500 per day.

31. Could any such claim lie, and if so was it correctly calculated? As to the first question, nothing in the charterers' letter extinguished or affected their primary obligations under the charterparty. I conclude that those continued to exist, notwithstanding the shippers' obligations assumed under their letter of 10th January.

32. I deal below, when considering the equivalent claim against the shippers, with the question of joint and/or several liability. At this stage it is sufficient to hold, as I do, that the charterers remained liable to the owners under the charter for demurrage at Port Sudan at the rate of $4,500 per day. And having checked the laytime calculations relied upon by the owners, I hold them to be correct. It follows that the owners' claim for such demurrage succeeds against the charterers for a total of $86,832.75 only.

33. Before leaving the question of this demurrage I would mention one point that occurred to me and upon which I reflected at a little length. Both the charterers and the shippers agreed specifically in their January letters when laytime had started counting, i.e. on 31st December, 2001 at 1300 hours. However, it was also on that date that the owners' claim for detention under clause 27 of the charter started to accrue.

34. It is peculiar that owners should be entitled to have detention payments made for a period during which laytime is also counting, and in the ordinary course of events one would think that not only inequitable, but impossible. However, that is what the parties here specifically agreed, and I am bound to implement their agreement. There is no reason to believe that all relevant considerations were not in the parties' minds at the time of their agreement: indeed, the contrary is likely to be the case. And it is probable that the owners insisted on this particular provision because of the very unusual circumstances in which they found themselves.

35. Accordingly, notwithstanding how unusual such a conclusion is, I have no hesitation in holding that - as regards both charterers and shippers - the owners' entitlement to demurrage at Port Sudan is not affected by and does not affect their entitlement to detention, or vice versa. (I need hardly add that this point was not raised by the parties, but simply results from my own consideration of the matter.)

36. The last of the owners' claims against the charterers is for $8,692.57 in respect of costs incurred in relation to the conclusion of the January agreement with the charterers. The owners said that it was a reasonably foreseeable consequence of the charterers'

breach in not paying freight and loading port demurrage timeously
that the owners would seek to negotiate a solution and would or
might reasonably incur costs in so doing. I agree. Such conduct
amounts to reasonable attempts to mitigate a breach-caused loss. I
also conclude, having examined the vouchers, that the sums
involved here were reasonably incurred. It follows that the owners'
claim for this amount succeeds in full.

37.  I now turn to consider the position as against the shippers. It
should be recalled that the owners' rights against them were not
based simply on the letter of 10th January, for the owners and the
shippers were already in contractual relations by virtue of the fact
that bills of lading were issued to the shippers by the owners.
Those bills of course evidenced contracts between the parties
thereto. They expressly incorporated the terms of the charterparty
agreement, including the arbitration clause. The shippers' status
was confirmed by a letter of indemnity they issued on 15th January,
2002 in which it was said that the cargo was shipped on "Shikoku
Pride" by them.

38.  Having regard to the clear provisions of the 10th January letter, it is
plain that the owners' claim for the balance of loading port
demurrage and freight in the sum of $10,204.29 must succeed in
full against the shippers, and I so find.

39.  Subject to the next point with which I deal, it is clear from the
provisions of the shippers' letter of 10th January and indeed under
the contracts of carriage evidenced by the bills of lading, that the
shippers

are liable for the discharging port demurrage claim in the sum of $115,777.01. The qualification arises in relation to the fact that, as I have already held, the charterers are also liable for demurrage for exactly the same period, although in a lesser sum. I accept the owners' submission that the liability of the shippers for this demurrage as created by para. 3 of their letter is a several liability of a non-cumulative nature. Thus, the shippers' liability does not affect that of the charterers, and *vice versa*.

40. It is therefore open to the owners to pursue either charterers or shippers, either individually or together, for payment of this demurrage on a several but non-cumulative basis, though the charterers' maximum liability is of course for the lower sum I have specified.

41. The cargo receivers made a claim under one of the bills of lading for an alleged shortage of 116 m.t. of sugar, claiming $42,975 plus legal costs of $4,825. The owners were advised that the Sudanese courts would retain jurisdiction over this claim and that they, the owners, were highly likely to be found liable for it. To allow the ship to sail appropriate security had had to be provided. In due course it was possible to settle the claim on very reasonable terms, i.e. by payment of only $20,000 in all.

42. The owners said that since the holds had been sealed throughout the voyage the cargo delivered was precisely what had been loaded; therefore the shippers' figures in the bills of lading must have been wrong and they must be liable under the Hague Rules. This may well be right, but the owners were on unshakeable ground in arguing that they were in any event entitled to be indemnified under para. 5 of the shippers' letter of 10th January. The claim for $20,000 therefore succeeded in full.

43. The owners also sought $6,687.93 in respect of the costs they said they had incurred in handling the cargo claim and its settlement. This sum was made up as to $5,187.93 in respect of lay correspondents' fees, and $1,500 in respect of a local lawyer's fees. (The claim as originally intimated was rather higher, but following enquiries from me the owners reduced it to exclude costs incurred in relation to a matter that could not be relevant.)

44. The lawyer's fees seemed to me eminently reasonable and therefore recoverable in full. The lay correspondents' fees were also no doubt reasonable for the work they did, but I have to observe that a good part of this was done not in relation to any claim that had been presented but rather in relation to checking the discharging as it took place. I do not think such charges are recoverable. They do not flow from any breach of contract. Had no claim manifested they would have had to be borne by the owners. The fact of the claim does not seem to me to change that position. Doing the best I could on the material before me I decided only to allow two-thirds of the amount in question, i.e. $3,458.62.

45. There was then a separate claim advanced by the owners against the shippers for a total of $6,078.83 in respect of costs and expenses said to have been incurred in connection with securing the owners' claim. When this claim was first intimated by the owners' lawyers I said in a fax that to the extent that the owners claimed costs simply in relation to seeking or obtaining security for their claims, I did not consider that I had any jurisdiction since it seemed (and still seems) to me that such costs are clearly not costs of the arbitration.

46. The owners' solicitors responded saying that where a party fails to make payments due under a contract it is a natural and reasonably

foreseeable consequence that the other party to the contract will seek to protect its position as far as possible including attempting to secure its claim.

47. If that argument were followed to its natural conclusion it would mean that a successful claimant could recover all its costs, not just those allowed in the ordinary course of legal proceedings, on the basis that it is reasonably foreseeable that a party deprived of its rights will issue proceedings and pursue them. Yet of course this is not what happens. Nor, so far as I know, has it ever been argued - at least not successfully - that costs such as those claimed here are recoverable other than as legal costs.

48. To seek to secure a claim does not seem to me to act in mitigation of a loss caused by a breach: rather it is to seek to avoid that loss becoming unrecoverable. There is no doubt in my mind that an arbitrator has no jurisdiction to award such costs as legal costs, and I do not think they can be treated as damages. Accordingly this claim must fail.

49. In the result, the owners' claims against the charterers succeeded in a total of $185,525.32 and those against the shippers in the total sum of $150,939.92. I reiterate what I have said in paragraphs 39 and 40 above about the owners' rights in respect of the demurrage part of the sums awarded.

50. I awarded interest from a single date which seemed to me appropriate in each case. The rate, lower than that claimed, reflects rates currently being awarded in London for the period in question. Costs followed the event, i.e. the owners were entitled to them in each matter, and I have reserved the right to assess them and make further awards in respect of the amounts so fixed.

SHIKOKU PRIDE
Summary of Awards

| Claims against PEC | | Amount | Finding | Awarded | |
|---|---|---|---|---|---|
| Shortfall of freight/load port demurrage | $ | 10,204.29 | Allowed | $ | 10,204.29 |
| Demurrage Claim | $ | 115,777.01 | Allowed* | | $ 115,777.01 |
| Cargo Claim | $ | 20,000.00 | Allowed | $ | 20,000.00 |
| Lawyers costs in cargo claim | $ | 1,500.00 | Allowed | $ | 1,500.00 |
| Correspondents costs in cargo claim | $ | 5,187.93 | Only 2/3 allowed as also involved in tallying, discharge monitoring. | $ | 3,458.62 |
| Costs in seeking security | $ | 6,078.83 | Not recoverable | $ | - |

Awarded $ 150,939.92

| Claims against Commodities Intertrade | | Amount | Finding | Awarded | |
|---|---|---|---|---|---|
| Shortfall of freight/load port demurrage | | withdrawn | | | |
| Detention off Sudan | $ | 90,000.00 | Allowed | $ | 90,000.00 |
| Demurrage (with reduction for overlap with detention claim) | $ | 115,777.01 | Allowed* at US$ 4500 per day but overlap awarded | $ | 86,832.75 |
| Costs in concluding January 9/10 Agreement | $ | 8,692.57 | Allowed | $ | 8,692.57 |

Awarded $ 185,525.32

*Demurrage claims are based upon a several liability of a non-cumulative nature, which means that Owners are free to pursue either PEC or Commodities Intertrade, individually or together, up to the full amount of their respective liabilities but cannot recover in total more than their actual entitlement. (i.e. they cannot make a double recovery).